## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**CHARLES LIVELY,**

       **Plaintiff,**

**v.**                      **Case No. 2:13-cv-28759**

**DAVID BALLARD, et al.,**

       **Defendants.**

### PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court is the defendants' Motion for Summary Judgment (ECF No. 64).

### PLAINTIFF'S ALLEGATIONS AND PROCEDURAL HISTORY

This case is proceeding on the plaintiff's Amended Complaint (ECF No. 32), which was docketed on October 7, 2014, but is considered filed *nunc pro tunc* to July 31, 2014.  The plaintiff also filed a Verification of his Amended Complaint on October 2, 2014.  (ECF No. 27).  The plaintiff has named the following defendants:  David Ballard, Warden at the Mount Olive Correctional Complex ("MOCC"); Jim Rubenstein, the Commissioner of the West Virginia Division of Corrections ("WVDOC"); James McCloud, Captain; Richard Coleman, Corporal; Russell Matheney, Captain; Jarod Dawson, Corporal; Chad Richmond, Correctional Officer II; Phillip Leasure, Correctional Officer II; and Justin

Cottrell, Correctional Officer II, each sued in both their individual and official capacities. The plaintiff seeks declaratory and injunctive relief, as well as monetary damages.

The plaintiff is serving a life sentence, with mercy, after being convicted of first degree murder and first degree arson in the Circuit Court of McDowell County, West Virginia. (ECF No. 64, Ex. 1). He had been incarcerated at MOCC since 2009. (ECF No. 65 at 4). The plaintiff's verified Amended Complaint alleges that, on December 13, 2011, while he was incarcerated in Pod 6, Cell 614 of the Quilliams I segregation unit at MOCC, he was maliciously attacked by defendants Coleman, Matheney, Dawson, Leasure, and Cottrell, who were members of a Corrections Emergency Response Team ("CERT"), with defendant McCloud serving as the unit commander of the segregation unit and a supervisor of the other defendants. (ECF No. 32, ¶¶ 4, 7, 8). The plaintiff first alleges that defendants Coleman and Matheney deployed chemical agents into the plaintiff's cell without giving him the opportunity to "cuff up" or come out of his cell peacefully. (*Id.*, ¶ 9). The plaintiff further alleges that the defendants also threw a "stun grenade" into his cell, then rushed into his cell, knocked him to the floor, and beat, kicked, punched, stomped and threatened him, before defendant McCloud tasered him twice as he lay on the floor. (*Id.*, ¶¶ 9-11). The Amended Complaint further alleges that Warden Ballard and Commissioner Rubenstein, as policymakers, permitted and promoted this behavior through policies, customs and practices (*Id.*, ¶¶ 2-3, 20), and that all of the defendants have maintained a "code of silence" and engaged in a conspiracy to conceal the pervasive unconstitutional behavior that led to the violation of the plaintiff's civil rights. (*Id.*, ¶¶ 2,-3, 19-20).

The Amended Complaint contains twenty (20) counts, which include both federal and state law causes of action. Counts 12, 13 and 19[1] were previously dismissed. (*See* Mem. Op. and Order, ECF No. 76). Thus, the undersigned will not further address those claims herein. The remaining claims are as follows:

Count 1 – 42 U.S.C. § 1983 Conspiracy (against all defendants); Counts 2-11 – 42 U.S.C. § 1983 Unreasonable and Excessive Force (against defendants Coleman, Matheney, McCloud, Dawson, Richmond, Leasure and Cottrell (hereinafter "the Defendant Correctional Officers"); Count 14 – 42 U.S.C. § 1983 Supervisory Liability (against defendants Rubenstein and Ballard); Count 15 – 42 U.S.C. § 1983 Monell Claim (against defendants Rubenstein and Ballard); Count 16 – Pendent Claim of Gross Negligence and Negligence (against defendants Rubenstein and Ballard); Count 17 – Pendent Claim of Assault and Battery (against the Defendant Correctional Officers); Count 18 – Pendent Claim of Intentional and Negligent Infliction of Emotional Distress (against the Defendant Correctional Officers); and Count 20 – Pendent Claim of Respondeat Superior (against defendants Rubenstein and Ballard).

On March 16, 2015, following the close of discovery, the defendants filed the instant Motion for Summary Judgment (ECF No. 64), including 19 exhibits, and a Memorandum of Law in support thereof (ECF No. 65). The plaintiff had previously been advised of his right and obligation to respond to any motion for summary judgment filed by the defendants, pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

---

[1] Although the plaintiff's Amended Complaint uses Roman numerals, from this point forward, the undersigned will use Arabic numerals (0-9) when referring to the various counts.

On March 25, 2015, the plaintiff filed a "Memorandum in Support of his Motion in Opposition to Defendants' Motion for Summary Judgment" (ECF No. 68) (hereinafter "the plaintiff's Response").  On May 4, 2015, the defendants filed a Supplemental Motion for Summary Judgment (ECF No. 70), submitting the executed and notarized copies of the affidavits of defendants Justin Cottrell (Exhibit 16), Jarrod Dawson (Exhibit 17), Phillip Leasure (Exhibit 18), David Ballard (Exhibit 20) and Jim Rubenstein (Exhibit 21).  On May 14, 2015, the plaintiff filed a Supplemental Response to the defendants' Supplemental Motion for Summary Judgment (ECF No. 71), in which he notes that the affidavit of James McCloud that was submitted as Exhibit 6 to the defendants' Motion for Summary Judgment was still unexecuted.  The plaintiff's Supplemental Response further contends that McCloud hadn't signed his affidavit because he has misrepresented the facts.  However, the plaintiff's Supplemental Response does not object to the filing of these affidavits by the defendants.

The plaintiff's Supplemental Response further asserts that he wishes to rely on WVDOC Policy Directive 312.02, Attachment #1 ("P.D. 312.02"), but is unable to produce the policy directive due to security issues that prohibited him from obtaining and possessing a copy of the same.  However, during discovery, the plaintiff was permitted to review a copy of this policy directive in the presence of defense counsel, and the defendants have submitted a copy of P.D. 312.02 and P.D. 313.02, and the attachments thereto, under seal for the court's review.  (ECF Nos. 79 and 81).

On May 28, 2015, the defendants filed a Reply to the plaintiff's Response in Opposition to their Motion for Summary Judgment (ECF No. 74) to which they attached, *inter alia*, an executed and notarized copy of the McCloud affidavit (ECF No. 74, Ex. 1), the unexecuted version of which is contained in Exhibit 6 to ECF No. 64.  The Reply brief

4

asserts for the first time that some of the plaintiff's allegations were not properly exhausted and further reiterates the defendants' argument that they are entitled to qualified immunity.  (*Id.*)  This matter is ripe for adjudication.

## STANDARD OF REVIEW

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010).  Material facts are those necessary to establish the elements of a party's cause of action.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  *Id.*  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  *Overstreet v. Kentucky Cent. Life Ins.* Co., 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:

> (A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)     showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may:  (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility.  *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## RELEVANT FACTS

Based upon a review of the record before this court, taken in the light most favorable to the plaintiff, the undersigned believes that the following facts are material and largely undisputed:

On December 13, 2011, the plaintiff learned that he had been dropped to punitive status based upon a rule violation that he contested and believed was going to be resolved in his favor through the intervention of Captain James McCloud. This was not done and caused the plaintiff to be upset. Due to his punitive status, the plaintiff was ordered to relinquish his television set ("TV") and refused to do so, even after almost 20 minutes of video-recorded discussion with Corporal David Miller and Supervised Psychologist Reshanda Plummer. (Pre-extraction Video, ECF No. 64, Ex. 3). During the discussions, the plaintiff unsuccessfully sought to speak to Captain McCloud about the situation. (*Id.*; ECF No. 5 at 10-11). As depicted on the Pre-extraction Video, the plaintiff specifically stated that, if the officers wanted the TV, they "would have to come and get it."[2] (ECF No. 3). By that time, the plaintiff had a towel wrapped around his neck and had also hung a bed sheet across a portion of his cell. (ECF Nos. 3, 4). During his deposition, the plaintiff admitted that he had a sheet up in his cell on a clothes line, but stated it was to cover and protect his clothes and paperwork "because certain CO's have been known to sneak up and just spray you real good and you will not know it." (ECF No. 5 at 13-14).

Because the plaintiff was still refusing to comply with the order to surrender his TV, Captain McCloud requested and received approval from Assistant Warden Paul Parry

---

[2] During his deposition, the plaintiff admitted that he "essentially told them if you want it [the TV] you are going to have to come and get it." (ECF No. 64. Ex. 5 at 12, 18-20). He further testified, "so I was like look, you know, I'm not giving you my TV. You know, I know you've got to do what you've got to do. I'm going to do what I got to do. I've tried it your way and you know it's not working, so you know do what you got to do." (*Id.* at 8).

to conduct a cell extraction.  (ECF No. 64, Ex. 2; ECF No. 74, Ex. 1).  The following CERT team was then assembled:  (1) Cpl. Jarrod Dawson - shield man with control of the head; (2) CO II Phillip Leasure - secondary cuffs with control of upper left appendage; (3) CO II Chad Richmond – primary cuffs; (4) CO II Justin Cottrell - secondary shackle and control of lower left appendage; (5) Cpl. Richard Coleman - primary shackle and lower right appendage; Capt. Russell Matheney - primary less lethal (Cell Buster and 9594 OC stingball grenade); (7) CO II Andrew Hudson – secondary less lethal (X-2 Taser).  (ECF No. 64, Exs. 2 and 4).

The entire cell extraction process was also video recorded.  (Extraction Video, ECF No. 64, Ex. 4).  Throughout the course of the pre-extraction discussion (ECF No. 64, Ex. 3) and cell extraction (*id*, Ex. 4), the plaintiff was not asked to "cuff up" and he did not offer to do so.

On the Extraction Video, when the CERT team enters the plaintiff's pod, the plaintiff can be observed looking out his upper-tier cell window (Cell 614) (ECF No. 64, Ex. 4 at 4:39); he then disappears from view.  As the CERT team reaches the top of the stairs and is lining up against the wall outside the plaintiff's cell, it appears that Capt. Matheney knocks on the plaintiff's cell door, but nothing is said. (I*d.* at 4:46).  At approximately 4:57 on the video, Capt. McCloud opens the food tray slot ("bean hole") of the plaintiff's cell, and Capt. Matheney deploys what appears to be four separate bursts of varying lengths of Cell Buster OC (oleoresin capsicum, also known as "pepper spray"), which, in total, lasts for approximately eight seconds.  (*Id.* at 4:59-5:07).  Capt. McCloud then closes the bean hole.

At approximately 5:19 on the video, Capt. McCloud reopens the bean hole and Capt. Matheney deploys a 9594 OC sting ball grenade.  Capt. McCloud again closed the

bean hole and the grenade explodes inside the plaintiff's cell at approximately 5:24 on the video. The plaintiff's cell door was then immediately opened and the CERT team enters the plaintiff's cell at approximately 5:29 on the video. The officer recording the video did not enter the cell and, at times, the camera viewpoint is blocked by the movements of the officers in and out of the doorway. Additionally, because a K-9, which was brought in for backup, begins to bark, the video does not provide any audible evidence of whether anything is said inside the plaintiff's cell.

However, the video depicts the CERT team struggling to gain control of the plaintiff's appendages and get him restrained. The defendants assert that the plaintiff was actively resisting; the plaintiff denies resisting and contends that he had been pushed under the bed, got turned around and was being pulled in different directions by the officers. At approximately 6:05 on the video, the CERT team having still not restrained the plaintiff, Capt. McCloud enters the plaintiff's cell and deploys a Taser to the plaintiff's left side.

Although not evident on the Extraction Video, the plaintiff apparently reached back and pulled out one of the leads from the Taser. Then (at approximately 6:11 on the video), Capt. McCloud deploys the Taser a second time. At that point, the CERT team is able to handcuff and shackle the plaintiff, who can be heard yelling and is observed in a prone position. From the video, it is difficult to determine the individual movements or actions of each member of the CERT team while inside the plaintiff's cell. However, there is no clearly visible evidence of any of the CERT team members kicking, beating, punching or stomping on any part of the plaintiff's body. Nor is there any video evidence of officers "high-fiving" one another or laughing, as asserted in the plaintiff's Amended Complaint.

The plaintiff was immediately carried to the recreation yard and medically assessed, treated and decontaminated, including a shower.  He was then placed in a different cell on the other segregation unit.

During this cell extraction, the segregation units and Armory were shut down; thus, normal prison operations were disrupted.  The plaintiff was subsequently charged with two rules violations as a result of this incident:  for refusing to surrender his TV, which he acknowledged doing, he was found guilty of refusing an order; he was also found guilty of obstructing, as a result of the shutdown of the segregation units and the Armory. (ECF No. 64, Exs. 9, 10 and 11).  During the rules violation hearing, Capt. McCloud clarified that he did not notify the plaintiff that he was being moved to the other segregation unit.  (ECF No. 64, Ex. 10; ECF No. 68, Ex. 14).

On December 28, 2011, the plaintiff filed a grievance concerning this incident. (ECF No. 64, Ex. 12).  In the grievance, the plaintiff addresses the use of OC spray, the grenade and the Taser and asserts that he was not barricaded in his cell and would have complied if officers had asked him to "cuff up."  However, the grievance does not in any way address the plaintiff being punched, kicked, stomped or beaten or any threats being made against him.

## ANALYSIS

### A. To the extent that the plaintiff seeks monetary relief from all of the defendants in their official capacities, all of the defendants are entitled to judgment as a matter of law on such claims.

The defendants' Memorandum of Law in support of their Motion for Summary Judgment first asserts that, to the extent that the defendants are sued in their official capacities, they are not "persons" under 42 U.S.C. § 1983 and, furthermore, in their official capacities, they are immune from suit for monetary relief.  Accordingly, they assert

that such claims must be dismissed.  (ECF No. 65 at 14-15).  The plaintiff's Response (ECF No. 68) does not specifically oppose the dismissal of these official capacity claims or in any way address this issue.

In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court stated:

> Obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.  We see no reason to adopt a different rule in the present context, particularly when such a rule would allow petitioner to circumvent congressional intent by a mere pleading device.
>
> We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.  The judgment of the Michigan Supreme Court is affirmed.  [Citations omitted].

Furthermore, pursuant to the Eleventh Amendment to the United States Constitution, the power of the federal judiciary does not extend to suits by a citizen of one state against another, or to suits by a citizen against his or her own state.  *Hans v. Louisiana*, 134 U.S. 1, 9 (1980).  Thus, the Eleventh Amendment of the United States Constitution bars a suit in a federal court by private parties seeking to impose monetary liability upon a State or State officials, which may be paid from public funds in the state treasury.  *Quern v. Jordan*, 440 U.S. 332, 337 (1979).

Absent consent, federal suits against a state by a citizen of that state or another state are prohibited by the Eleventh Amendment.  *Kentucky v. Graham*, 473 U.S. 159, 199 (1985); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 99-100 (1984).  The Eleventh Amendment, however, permits a federal court to enjoin state officials to conform their future conduct to federal law, which is distinguishable from a retroactive monetary award paid from State funds.  *Id.* at 337.  Thus, the undersigned proposes that

the presiding District Judge **FIND** that all of the defendants are immune from liability for monetary damages in their official capacities under the Eleventh Amendment and, accordingly, all of the defendants are entitled to judgment as a matter of law on the plaintiff's claims for monetary damages against them in their official capacities.

### B.    The plaintiff's Eighth Amendment claims against defendants Coleman, Matheney, McCloud, Dawson, Richmond, Leasure and Cottrell for alleged use of unreasonable and excessive force (Counts 2-11).

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment in violation of the Eighth Amendment even when the inmate does not suffer serious injury.  The Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley [v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  503 U.S. at 6.  The majority opinion noted that "[t]he objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" 503 U.S. at 8. [Citation omitted.]

In *Whitley*, the Supreme Court identified five factors to be used in determining whether a particular use of force was excessive.  Those five factors are:  (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response. 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996). The *Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.  The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547).  Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury."  *Id.* at 322.

In Counts 2-11 of the Amended Complaint, the plaintiff alleges that the conduct of defendants Coleman, Matheney, McCloud, Dawson, Richmond, Leasure and Cottrell (hereinafter "the Defendant Correctional Officers") in the course of extracting him from his segregation cell violated his right to be free from cruel and unusual punishment, as guaranteed by the Eighth Amendment.  (ECF No. 32 at 12-13).  These claims appear to be best summarized in paragraph 12 of the Amended Complaint, which states:

> The defendants did maliciously and sadistically administer the intentional and wanton infliction of severe bodily injuries through deliberate sadistic and malicious excessive use and abuse of chemical agents, the unwarranted and excessive use and abuse of a stun grenade, the excessive and unwarranted beating, kicking, punching, stomping of the Plaintiff's head, neck, face, arms, legs and body, the excessive and unwarranted use and abuse of a Taser Gun, all of which were accompanied by threats of death; clearly the [Defendant Correctional Officers] intentionally used excessive force with sadistic, malicious intent to injure, oppress, threaten and intimidate the Plaintiff; and at no time did they comply with WV DOC Policy and Procedure by offering the Plaintiff an opportunity to cuff-up and come out of his cell peacefully, and at no time did they attempt to handcuff or

shackle the Plaintiff until after their completion of their intentional and multiple assaults.

(ECF No. 32, ¶ 12).

Concerning the plaintiff's Eighth Amendment claims, the defendants' Memorandum of Law states:

> In the present case, it is undisputed that efforts to temper were made. *See* video tape. Plaintiff Lively testified he "essentially told them if you want it [the TV], you are going to have to come and get it." Plaintiff's Dep. at 12, [lines] 18-20. He further testified: "so I was like look, you know, I'm not giving you my TV. You know, I know you've got to do what you've got to do. I'm going to do what I got to do. I've tried it your way and you know it's not working, so [sic; you] know do what you got to do." Lively Dep. tr. 8, [lines] 7-11.
>
> It is further undisputed that: Lively had a sheet hanging in cell; he had a towel around his neck/face to counter chemical agents. *See* extraction video; and when the extraction team approached he did not say anything; instead he had turned to allegedly unplug his television. Lively was actively resisting and reasonable efforts were made to obtain compliance.

(ECF No. 65 at 29-30). The Memorandum of Law then notes that a number of the allegations in the plaintiff's Amended Complaint are inconsistent with the statements he made when he filed his grievance concerning this incident and with the video evidence thereof. Specifically, he did not mention anything in his grievance about being "beat, kicked, punched and stomped upon his face, head, neck and body" by the defendants while they "shout[ed] encouragement to each other and threats of death to the injured and incapacitated plaintiff . . . ." (ECF No. 32, ¶ 2). All of the defendants' affidavits produced with their Motion for Summary Judgment deny that any such conduct occurred. (ECF No. 64, Exs. 15, 19; ECF No. 70, Exs. 16, 17, 18, 20 and 21; ECF No. 74, Ex. 1).

Moreover, there is no obvious evidence of such conduct on the extraction video, which, pursuant to *Scott v. Harris*, 530 U.S. 372 (2007), can be considered by this court to be undisputed evidence sufficient to warrant summary judgment, if the court

14

determines that, the plaintiff's version of events is "so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380-381. The defendants herein assert that, as demonstrated by the video evidence of the cell extraction and the other evidence of record, the force used against the plaintiff was applied in a good faith effort to maintain or restore discipline. The defendants also offer the opinion of Sam Faulkner, a proposed expert in defensive tactics/subject control and police and correctional procedures, who reviewed this use of force and opined as to the reasonableness thereof. (ECF No. 64, Ex. 8). Accordingly, the defendants assert that the plaintiff cannot successfully establish that any of the Defendant Correctional Officers violated his Eighth Amendment rights.

The defendants' Memorandum of Law in support of their Motion for Summary Judgment further asserts that the Defendant Correctional Officers are entitled to qualified immunity[3] on the plaintiff's Eighth Amendment claims against them and sets forth the following test to determine whether an officer is entitled to qualified immunity: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right; and (2) was that right clearly established such that a reasonable person would have known that their conduct was unlawful. *See Siegert v. Gilley*, 500 U.S. 226, 232 (1991). The defendants assert that "the test for use of excessive force and qualified immunity are separate and distinct. In essence, qualified immunity is secondary to a defense that an officer did not exert excessive force." (ECF No. 65 at 37, citing *Saucier v. Katz*, 523 U.S. 194, 205 (2001)).

---

[3] Qualified immunity "shields government officials from liability for civil damages provided their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Baltimore Cty.*, 713 F.3d 723, 731 (4th Cir. 2013).

Thus, the defendants further assert that, "[e]ven if a court determines that a prison official used un-permitted, excessive force, that law enforcement official is entitled to a qualified immunity defense so long as 'the law did not put the officer on notice that his conduct would be clearly unlawful.'" *See Malley v. Briggs*, 475 U.S. 335, 341 (1986). (ECF No. 65 at 36-37). Furthermore, in *Pearson v. Callahan*, the Supreme Court held that a court may exercise its sound discretion to decide which prong of the inquiry to address first. 555 U.S. 223, 242 (2009); *see also Oliver v. Fiorino*, 586 F.3d 989, 905 (11th Cir. 2009).

The plaintiff's Response (ECF No. 68) asserts that there are genuine issues of material fact that should prevent summary judgment for the defendants. Specifically, the plaintiff's Response disputes the amount of OC spray that the defendants contend was deployed, and whether he was incapacitated following such deployment, thus, asserting that no further force was necessary. (*Id.* at 2-3). The plaintiff further disputes whether the sting ball grenade is designed for "crowd control" and was not appropriate for use in an 80 square foot cell. (*Id.* at 3). Finally, the plaintiff asserts that he was already on the floor in a prone position in an attempt to surrender and cuff up when the defendants rushed in and began to assault him and make verbal threats. (*Id.*) The plaintiff further denies that he was resisting. (*Id.*)

In asserting that the defendants' conduct was unlawful, the plaintiff's Response relies heavily on the defendants' alleged failure to comply with prison policy directives. In particular, the plaintiff contends that the defendants violated policies because they did not offer him an opportunity to cuff up before the use of any force. (*Id.* at 6). The plaintiff asserts that, had defendant McCloud come to talk to him about his prior disciplinary

situation, he would have peacefully surrendered his TV and no use of force would have been necessary.  (*Id.* at 5).  His Response further states:

> It is also clear from the record and video that the Plaintiff was never given the final option to cuff up before the extraction team deployed chemical agents and entered the Plaintiff's cell.  Policy is clear you must give the Plaintiff an option to cuff up before force and Capt. McCloud did not follow policy.  The Plaintiff maintains that he was never given an option to cuff up and voluntarily come out of his cell before force was used and this can be demonstrated by the extraction video.  Not after the extraction team arrived, not after they first sprayed the Plaintiff with chemical agents, and not even after the extraction team entered the cell they never asked the Plaintiff to cuff up.  Why?  It was clear that the Plaintiff was undoing the cable wire to his TV when the extraction team arrived at his cell and when he was sprayed.  It was clear by the extraction team's blatant violation of multiple policies that they were there to enter the Plaintiff's cell and not to get him to cuff up and voluntarily come out of his cell.  The Plaintiff never once said he wouldn't come out or cuff up and was more than willing to come out of his cell so why was force used?

(*Id.* at 6).  The plaintiff's Response also takes issue with the defense expert witness Sam Faulkner's summary of the facts and opinions.  (*Id.* at 6-11).

The defendants' Reply affirmatively asserts for the first time that the plaintiff failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a) concerning some of his allegations regarding the use of force challenged in his Amended Complaint. (ECF No. 74 at 2-3).  Specifically, the Reply states that the plaintiff's grievance filed on December 28, 2011, complained that the plaintiff was tased twice while lying flat; that the force used while he was already restrained was excessive; that he was never given the opportunity to cuff up, and, that if he had been given that opportunity at first, he "may have" and "certainly would have after the spray or after the grenade."  (*Id.* at 2; ECF No. 64, Ex. 12, Grievance).  The Reply reiterates that the plaintiff's grievance "makes no mention of any kicking, beating, stomping, threats of death or officers pulling on his leg shackles . . . ."  (ECF No. 74 at 2).

The Reply further asserts that the plaintiff's Response adds the following new allegations that were not specifically asserted in his grievance or his prior filings in this court:

- Plaintiff heard one of the Defendants say "you think your [sic] tough motherfucker" and "Today might be your day to die."  (ECF No. 68 at 3).
- Defendants said "get ya some"[4] and "hit him again."  *Id.*; Plaintiff Affidavit/Declaration, Ex. 2-a.
- The Correctional Officer who grabbed and pulled on his shackles did so when he was taken to Rec yard. Plaintiff Affidavit, Ex. 1,¶ 17.

(ECF No. 74 at 3).  Thus, the defendants now assert that any unexhausted allegations should be dismissed under section 1997e(a).  (*Id.* at 4-6).

 The defendants' Reply also reiterates their contention that the Defendant Correctional Officers are entitled to qualified immunity.  (ECF No. 74 at 6).  The Reply further asserts:

> In the present case, the conduct of the officers did not violate the constitutional rights of Plaintiff.  As outlined in detail above, under the circumstances presented, the use of force was reasonable.  Although Plaintiff finds fault in the use of an OC stingball grenade, pursuant to his own interpretation of Policy Directive 312.02, Major Williams has opined that Defendants were within their rights to use this tool inside his cell.  (Ex. 2).[5]  Further, Defendants deny kicking, beating, stomping, threats of death, officers encouraging each other to "get some," or officers pulling on his leg shackles.  (Ex. 1).

---

[4]  The undersigned notes that the plaintiff's Amended Complaint specifically alleged that the officers "maliciously and sadistically beat, kicked, punched, stomped and continuously threatened the Plaintiff with death; all the while encouraging each other to continue the assault shouting "Get Some."  (ECF No. 32, ¶ 10).

[5]  With their Reply, the defendants offer the affidavit of Major Ronnie Williams, Chief of Operations for the WVDOC, who reviewed the Use of Force Committee Report prepared after the plaintiff's incident and opined that the force used against the plaintiff, including the sting ball grenade, is not prohibited by P.D. 312.02, and that the Use of Force Model contained in that policy clearly states that "[t]hese are general guidelines and each situation should be assessed for the appropriate intervention strategy."  (ECF No. 74 at 3-4 and Ex. 2).

(ECF No. 74 at 6).  The defendants further assert that their actions were within the bounds of Policy Directive 312.02, and that:

> [B]ased upon Plaintiff's own admissions in his [Response], he was not cooperating with the Correctional Officers and he was angry because he felt Capt. McCloud had lied to him.  Further, the claimant readily admits that he wanted to speak to Capt. McCloud prior to relinquishing the television set he was instructed to hand the officers.  Due to his hostile behavior, anger over his punishment, and failure to comply with multiple direct requests, the Correctional Officers proceeded to obtain compliance in accordance with the applicable use of force guidelines.  (Ex. 2)  Therefore, there was nothing unlawful regarding the officers' actions taken in an effort to subdue the claimant and obtain compliance and the officers are entitled to qualified immunity.

(*Id.* at 7).

### The defendants' exhaustion defense

Section 1997e(a) of the Prison Litigation Reform Act of 1995 ("the PLRA"), 42 U.S.C. § 1997e(a), states that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  "Prison conditions" means ". . . conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings."  18 U.S.C. § 3626(g)(2).  In *Booth v. Churner*, 532 U.S. 731 (2001), the Supreme Court of the United States held that exhaustion of administrative remedies is mandatory, regardless of the type of relief sought or offered through the administrative procedures.  *Id.* at 741.  In *Booth*, the Court required exhaustion even where the grievance process does not permit the award of money damages, and the prisoner seeks only money damages, as long as the grievance tribunal has authority to take some responsive action.  *Id.*

In *Porter v. Nussle*, 534 U.S. 516, 532 (2002), the Court held "that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Not only must a prisoner exhaust his administrative remedies, but he must also do so properly. Proper exhaustion "'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 2385 (2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). [Emphasis in the original]). That is, a prisoner must complete the administrative process in accordance with the applicable procedural rules of the process in place at the time, including the deadlines. However, the undersigned believes that, in December of 2011, West Virginia law exempted "past, current and imminent . . . physical abuse" from its prisoner litigation exhaustion requirement. W. Va. Code § 25-1A-2(c).[6]

In *Jones v. Bock*, 549 U.S. 199, 216 (2007), the Supreme Court ruled that an inmate's failure to exhaust remedies under the PLRA is an affirmative defense; the inmate need not demonstrate in his complaint that he has exhausted applicable remedies. *Jones* also held that an inmate does not automatically fail to exhaust when the inmate sues one or more defendants not named in the pertinent grievances. *Id.*, at 218. If a complaint contains claims, some of which have been exhausted, and some of which have not been exhausted, the entire complaint is not dismissed; the court proceeds only on the exhausted claims. *Id.*, at 219-224.

---

[6]  The West Virginia PLRA was amended in July of 2013 and it now appears that claims concerning past physical abuse must be exhausted through the normal available grievance process. *See* W. Va. Code §§ 25-1A-2 and 2a and W. Va. C.S.R. §§ 90-9-1 through 90-9-8.

The defendants assert that the plaintiff's allegations that the defendants physically abused him (kicking, beating, stomping, punching in the face) prior to restraining him were not exhausted through the grievance he filed over this incident. Nevertheless, because the defendants have addressed the affirmative defense of failure to exhaust administrative remedies for the first time in a Reply to a Motion for Summary Judgment, it is questionable as to whether the defense is properly before the court. *See Noel v. Artson*, 297 Fed. App'x 216, 218-219 (Oct. 22. 2008) (affirmative defense hinted at but not raised until a reply brief to a summary judgment motion deprived the plaintiff of opportunity to be heard and for full consideration of the issue).[7] Therefore, the undersigned proposes that the presiding District Judge deny the defendants' request for dismissal of the physical abuse allegations on this basis, and address the merits of that portion of the plaintiff's claims.

<u>*Eighth Amendment claims and qualified immunity*</u>

Addressing the force used against the plaintiff under the *Whitley* factors, it is clear that the defendants made attempts to temper the necessity for a use of force through the discussions with the plaintiff as documented by the Pre-extraction Video and the incident reports detailing other such attempts. (ECF No 64, Exs. 2 and 3). However, the subsequent Extraction Video (ECF No. 64, Ex. 4) demonstrates that no verbal warning to submit to handcuffing, as set forth in Policy Directive 313.02 Attachment #1, Section 3(f) (ECF No. 79 at 25, filed under seal), was provided to the plaintiff when the officers arrived at his door, before the use of force began.

---

[7]  Moreover, the defendants filed a prior Motion to Dismiss in which this affirmative defense could have been raised.  The undersigned notes, however, that the defendants did assert this affirmative defense in their Answer to the Amended Complaint.  (ECF No. 51 at 14, Eighteenth Defense).

The plaintiff has stated that, at that point, he was attempting to comply by disconnecting his TV cable and has repeatedly stated that no one ever asked him to cuff up.  (ECF No. 5 at 12, 14 and 16).  On the other hand, in light of the plaintiff's admitted refusal to surrender his TV, his invitation to prison staff to "come and get it," and his placement of a towel over his face and neck and a sheet across a portion of his cell, the defendants assert that there was a need for some use of force in order to get the plaintiff to comply with their orders and that, indeed, he expected some use of force to occur.  Looking at this evidence in the light most favorable to the plaintiff, there is a genuine issue of material fact as to whether any force was necessary; therefore, there are questions of fact with regard to the first and fifth *Whitley* factors concerning the need for force and the efforts to temper the severity of a forceful response.

Turning to the second *Whitley* factor, the relationship between the need for force and the amount of force used, the undersigned believes it is necessary to assess each form of force used by the defendants, beginning with the deployment of OC spray into the plaintiff's locked cell.  In *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008), well before the incident in question, the United States Court of Appeals for the Fourth Circuit reiterated that, while "some dispersal of pepper spray may be warranted in carrying out a cell extraction," and pepper spray "is a commonly used method of incapacitating inmates for this purpose," "it is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas *or other chemical agents in quantities greater than necessary* or for the sole purpose of infliction of pain."  Thus, this court is faced with the question of whether, under this clearly-established precedent, the plaintiff can demonstrate that an excessive amount of pepper spray was deployed into his cell.

22

The defendants' incident reports uniformly state that defendant Matheney deployed three one-second bursts of pepper spray into the plaintiff's cell. However, as noted above, the Extraction Video clearly demonstrates that four separate bursts of OC spray were deployed, which lasted approximately eight seconds. The plaintiff contends that this action violated WVDOC policy, which, he asserts, requires two one-second bursts of OC spray. While Policy Directive 312.02 states that "tools or techniques listed in this level of control must be employed in the manner set forth in the manufacturer's recommendations and approved training guidelines" (ECF No. 79 at 6), the policies filed in the record do not specify an approved or recommended amount of OC spray therein; nor have the parties submitted any evidence concerning the manufacturer's recommendations and approved training guidelines.

Based upon the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that there are genuine issues of material fact concerning the need for the use of OC spray and the amount of OC spray that was used, which prohibit judgment as a matter of law for the defendants concerning that use of force.

Turning to the deployment of the sting ball grenade in the plaintiff's cell, the plaintiff contends that WVDOC policies have not approved the use of such tools in single 80 square foot cells. The plaintiff asserts that he suffered permanent hearing loss as a result of the grenade exploding close to his ear and he has offered medical records to support his contention that he has needed additional diagnosis and treatment for the same. (ECF No. 68, Ex. 13).

The defendants, on the other hand, assert that such use is not prohibited. Attachment #1 to Policy Directive 312.02 contains a chart which lists  "distraction devices," such as sting ball grenades, as tools to be used to combat "active aggression or

aggravated actual aggression in <u>common areas</u>."  (ECF No. 81, filed under seal).  However, the policy directive attachment itself states that it is merely a guideline.

The undersigned has been unable to locate any authority from the United States Supreme Court or within the Fourth Circuit that addresses the reasonableness of using such grenades in individual cells.  However, the undersigned was able to locate some authority in another jurisdiction in which the court determined that there were genuine issues of material fact concerning the reasonableness of such use of force.  In *Jackson v. Gerl*, 622 F. Supp.2d 738, 748-749 (W.D. Wisc. 2009), after weighing the *Whitley* factors concerning the deployment of a "stinger" grenade into a single inmate's cell, the court found that a reasonable jury could decide either way on the matter, and denied summary judgment for the defendant.  The district court further declined to address the issue of qualified immunity for such a claim because the defendant had not timely raised such a defense.

In the instant case, the defendants have asserted a right to qualified immunity on the plaintiff's Eighth Amendment claims as a whole.  Whether sting ball grenades are designed for and safe to use in individual cells versus in crowd control is a question that does not appear to have been definitively answered.  Nevertheless, even if the plaintiff were able to demonstrate that the deployment of such a grenade into his cell was an excessive use of force under the circumstances presented, because it is not "sufficiently clear that every reasonable official would have understood that what he is doing violates that right," *Mullenix v. Luna*, ____ U.S. ____, 136 S. Ct. 305, 308 , 193 L. Ed.2d 255 (2015), the undersigned proposes that the presiding District Judge **FIND** that, in December of 2011, it was not clearly established that deploying a sting ball grenade into the individual cell of an allegedly noncompliant inmate during a cell extraction was unconstitutional.

24

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the Defendant Correctional Officers are entitled to qualified immunity on the use of the sting ball grenade.

Likewise, in *Estate of Armstrong ex rel. Armstrong*, 810 F.3d 892 (4th Cir. 2016), the Fourth Circuit recently addressed the question of whether, in April of 2011, it was clearly established that using a Taser on a stationary, non-violent, but resisting individual in the course of a lawful seizure was clearly established.  The *Armstrong* Court found that the defendants' conduct violated the plaintiff's Fourth Amendment rights; however, following a survey of available authority in our circuit and sister circuits, the Court concluded that the right not to be tased under such circumstances was not clearly established, further noting that another Fourth Circuit panel had found as follows:

> "[T]he objective reasonableness of the use of Tasers continues to pose difficult challenges to law enforcement agencies and courts alike . . . . 'That the law is still evolving is illustrated in cases granting qualified immunity for that very reason.'"  *Henry v. Purnell*, 652 F.3d 524, 539-40 (4th Cir. 2011) (Davis, J., concurring) (quoting *McKenney v. Harrison*, 635 F.3d 354, 362 (8th Cir. 2011) (Murphy, J., concurring)).

*Armstrong*, 810 F. 3d at 909; *See also, e.g., Bell v. Kansas City Police Dep't*, No. 08–456, at 4–5 (W.D. Mo. Mar. 22, 2010) (granting qualified immunity to police officer in "close case" because "there is not enough law warning defendant against tasering to justify this [excessive force] litigation").

The use of the Taser twice on the plaintiff makes this a close case.  It is clear from the video that, once the CERT team entered the plaintiff's cell, some sort of struggle ensued.  However, the video does not depict any sort of violent action by the plaintiff; nor does it appear that the defendants were in a high degree of danger from the plaintiff,

notwithstanding their proximity to him.[8]   Rather, the facts herein merely appear to establish "bare noncompliance" or "non-violent resistance" by the plaintiff.

The undersigned proposes that the presiding District Judge **FIND** that, in December of 2011, it was not clearly established that using a Taser on a non-violent, but resistant inmate during a cell extraction was unconstitutional.   Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the Defendant Correctional Officers are also entitled to qualified immunity on the use of the Taser.

Finally, turning to the alleged physical assault of the plaintiff prior to his placement in restraints, it, of course, has been clearly established since *Hudson, supra,* that use of excessive physical force against an inmate may constitute cruel and unusual punishment in violation of the Eighth Amendment even when the inmate does not suffer serious injury.   The plaintiff's verified Amended Complaint and affidavits/declarations contend that, when the Defendant Correctional Officers entered his cell, he was kicked, beaten, stomped, punched and that threats were made against him.   The defendants absolutely deny that any such conduct occurred and the incident reports do not contain any evidence of such conduct.   Furthermore, there is no apparent evidence of such conduct on the video; however, the video does not fully permit the viewer to see the actions of each defendant in the course of the struggle with the plaintiff in his cell.

 In *Witt v. West Virginia State Police Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011), the Court held that the Supreme Court's *Scott* decision "does not permit a court to reject one side's recitation of the facts as a matter of law if the 'documentary evidence such as a

---

[8]   As noted by the *Armstrong* Court, which was addressing a Fourth Amendment claim involving the use of a Taser, "at bottom, 'physical resistance' is not synonymous with 'risk of imminent danger.'"   890 F.3d at 905.   The undersigned recognizes that the Fourth Amendment inquiry differs from that of the Eighth Amendment, but nevertheless finds this statement to be instructive with regard to the *Whitley* factors of the need for this use of force, the amount of the force and the threat perceived by the officials.

video' merely 'offers *some* support for [the other side's] version of events.'"  Such is the case here with respect to the Extraction Video.  Taking the evidence in the light most favorable to the plaintiff, even though it ultimately may not be found to be credible by a jury, there is a genuine issue of material fact concerning the plaintiff's claim that the Defendant Correctional Officers used unlawful physical force against him inside his cell in the course of the cell extraction.  Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the defendants are not entitled to judgment as a matter of law and qualified immunity on this aspect of the plaintiff's excessive force claims.

### C.   Assault and Battery (Count 17).

In Count 17 of his Amended Complaint, the plaintiff alleges that the Defendant Correctional Officers committed "atrocious acts of battery" arising out of the same conduct that he asserts supports his Eighth Amendment claims.  (ECF No. 32, ¶¶ 83).

Under West Virginia law, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *W. Va. Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 494 (W. Va. 2004) (quoting Restatement (Second) of Torts § 13 (Am. Law Inst. 1965)); *see also Hutchinson v. W. Va. State Police*, 731 F. Supp. 2d 521, 547 (S.D. W. Va. 2010) ("Stated simply ... battery is any harmful or offensive contact."). The Supreme Court of Appeals of West Virginia also noted that, in "order to be liable for a battery, an actor must act with the intention of causing a harmful or offensive contact with a person." *Stanley*, 602 S.E.2d at 486 (citation omitted). "An activity that would otherwise subject a person to liability in tort for ... battery, however, does not constitute

tortious conduct if the actor is privileged to engage in such conduct." *Hutchinson*, 731 F. Supp. 2d at 547 (citing *Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1231 (5th Cir. 1988)). For example, "[a] privilege may be based upon ... the fact that its exercise is necessary for the protection of some interest ... of the public which is of such importance as to justify the harm caused or threatened by its exercise." Restatement (Second) of Torts § 10 (Am. Law Inst. 1965).

In light of the fact that genuine issues of material fact remain concerning the deployment of OC spray and the alleged physical abuse of the plaintiff during this cell extraction, the undersigned proposes that the presiding District Judge **FIND** that the court cannot presently rule as a matter of law that the defendants were privileged to use such force.  Therefore, the undersigned further proposes that the presiding District Judge **FIND** that there are genuine issues of material fact that prohibit judgment as a matter of law for the Defendant Correctional Officers on the plaintiff's state law assault and battery count contained in Count 17 of the Amended Complaint.

### D.    Section 1983 Conspiracy (Count 1).

In Count One of his Amended Complaint, the plaintiff alleges that all of the defendants "conspired with each other and others to reach a mutual understanding and acted to undertake a course of conduct to injure, oppress, threaten and intimidate Charles Lively . . . including . . . the intentional use of unreasonable force and intentional infliction of emotional distress, pain or suffering."  (ECF No. 42, ¶ 35).  The Amended Complaint further alleges:

> The WVDOC commissioner, James Rubenstein, and MOCC Warden, David Ballard, through their agents (correctional officers) are believed to be willful participants in joint action with their subordinate correctional officers acting under color of state law.   It is believed that the WVDOC Commissioner James Rubenstein; and MOCC Warden David Ballard; their

agents (named defendants) participated in the conspiracy to further the illegal and improper purposes and goals, including the goal of maintaining the "codes of silence."

(*Id.*, ¶ 36).  The Amended Complaint then goes on to detail 11 ways the plaintiff believes that the Defendant Correctional Officers violated WVDOC and MOCC policies and procedures through the use of force against him in the course of his cell extraction.  (*Id.*, ¶¶ 37-44).  The plaintiff then contends as follows:

> In furtherance of the conspiracy to conceal and cover-up the acts of brutality that resulted in permanent, severe injuries, physically, mentally and emotionally (psychologically) the defendants engaged in the following:
>
> (a)  falsified incident reports and violation reports against Charles Lively;
>
> (b)  fabricated and contrived false rule violations against Charles Lively that contradicted, one claimed force was used because Charles Lively refused to surrender his TV; another claimed force was used because Charles Lively was told he had to move to another cell but refused to move;
>
> (c)  deliberately suppressed the truth, although they were aware of the brutality and the use of excessive force that rendered Charles Lively permanently injured and were required to report it immediately; and
>
> (d)  submitted false incident reports, statements, or testimony to support and corroborate the fabricated charged rule violations lodged against Charles Lively and to insulate defendants Coleman, Matheney, McCloud, Dawson, Richmond, Leasure and Cottrell from administrative and criminal sanctions as well as civil action and sanctions.

(*Id.*, ¶ 45).

The defendants' Memorandum of Law in support of their Motion for Summary Judgment sets forth the following elements to state a claim for civil conspiracy under section 1983:  a party must allege "that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in the [plaintiff's]

deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Thus, the defendants contend that the plaintiff must demonstrate all three elements of (1) an agreement between at least two parties; (2) an overt act in furtherance of the conspiracy; and (3) a constitutional injury that was proximately caused by the conspiracy. *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). (ECF No. 65 at 16).

The defendants' Memorandum of Law further asserts that the Plaintiff has not alleged or demonstrated facts to support a finding that there was an agreement between or among the defendants or that there was an overt act in furtherance thereof "to promote a code of silence." (*Id.*) They further assert:

> It is undisputed that an extraction was only requested and authorized after Lively refused to relinquish his television. It was undisputed that members of the extraction team were assembled as demonstrated on the video. It is undisputed that Lively said if they wanted his television they had to come and get it. As set forth in the extraction video, the officers walked in formation into the cell. There is no evidence that they conspired to form the extraction team as a cover "to harm" Lively as he asserts. This claim must be dismissed as a matter of law.

(*Id.* at 28).

The plaintiff's Response to the Motion for Summary Judgment speculates that, if McCloud lied and misled others about the prior disciplinary issue, it stands to reason that he would do so again with regard to this incident. He further asserts that false or fraudulent information has been placed in the incident reports and documentation concerning this incident in an attempt to justify this use of force; particularly, McCloud's assertion that the plaintiff had been ordered to move to another housing unit, and refused to do so, which the plaintiff adamantly disputes. (ECF No. 68 at 5-6).

However, notwithstanding the fact that some of his Eighth Amendment claims against the Defendant Correctional Officers may survive summary judgment, the plaintiff

has not offered any evidence that demonstrates a specific agreement among the defendants to violate his constitutional rights.  Moreover, even taking his allegations concerning false or fraudulent information in the incident and rule violation reports in the light most favorable to him, he has not established that such conduct deprived him of the right to pursue legal redress or in any way proximately caused a separate violation of his clearly established constitutional rights.  *See, e.g., Noble v. Chambers*, 2013 WL 3338659 (E. D. Va., July 2, 2013) (The plaintiff "must allege and prove both a conspiracy and *an actual deprivation of rights.*"); *see also Webb v. Raleigh Cnty. Sheriff's Dep't.*, 761 F. Supp.2d 378, 398 (S.D. W. Va., Dec. 28, 2010) (Berger, J.) (A civil conspiracy is not a per se, stand alone cause of action).   Thus, the undersigned proposes that the presiding District Judge **FIND** that the defendants are entitled to judgment as a matter of law on Count 1 of the plaintiff's Amended Complaint because he has not demonstrated evidence to meet the essential elements of civil conspiracy.

### E.   Supervisory liability, *Monell* claim and *respondeat superior* (Counts 14, 15 and 20).

In Count 14 of his Amended Complaint, the plaintiff alleges that defendants Rubenstein and Ballard "were in a superior position" and "had oversight responsibility" of the Defendant Correctional Officers, and were "responsible for training, instruction, supervision and discipline" of those defendants.  (ECF No. 32 at ¶ 56).  He further alleges that Rubenstein and Ballard were "policy makers."  (*Id.*)  The Amended Complaint further alleges:

> It is believed that defendants Rubenstein and Ballard have received complaints about the conduct of the [Defendant Correctional Officers] in the past, knew about their past complaints, aberrant behavior, and infractions, or in the exercise of due diligence, should have perceived that these officers had and have conduct and disciplinary problems that posed a pervasive and unreasonable risk of harm to Charles Lively.

(*Id.*, ¶ 57).  The Amended Complaint further asserts that Rubenstein and Ballard knew or should have known that the defendants' conduct with regard to Lively was likely to occur, and failed to take any preventative or remedial measures against the brutality and cover-up by the Defendant Correctional Officers.  (*Id.*, ¶¶ 58-59).

The defendants' Memorandum of Law asserts that the United States Court of Appeals for the Fourth Circuit has recognized the existence of supervisory liability in the following context:

> We have recognized section 1983 claims against supervisory employees where citizens "face a pervasive and unreasonable risk of harm from some specified source . . . [and] the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive [practices]." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (internal quotation marks omitted).  As with municipal liability, <u>*respondeat superior* is not the standard</u>.  A plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk and "an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

*Carter v. Morris*, 164 F.3d 215, 220-21 (4th Cir. 1999) [Emphasis added].  Thus, even if the Defendant Correctional Officers were acting within the scope of their employment during this incident, the defendants correctly assert that defendants Rubenstein and Ballard cannot be held vicariously liable under a theory of *respondeat superior* for any intentional unlawful acts of the Defendant Correctional Officers' conduct, simply because they serve in a supervisory capacity as their "employer."  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that defendants Rubenstein and Ballard are entitled to judgment as a matter of law on Count 20 (*Respondeat Superior*) of the Amended Complaint.

Rather, defendants Rubenstein and Ballard may only be held liable on the plaintiff's Eighth Amendment claims if he can meet the *Shaw* criteria discussed above; that is:

1)   The supervisor had an actual subjective awareness that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

2)   The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and

3)   There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

Defendants Rubenstein and Ballard have offered their own affidavits in which they deny engaging in any conduct that would give rise to their liability under the Eighth Amendment and assert that they are neither actually aware of, nor have they tacitly authorized, any pervasive misconduct that caused a constitutional injury to the plaintiff. (ECF No. 70, Exs. 19 and 20).  Their Memorandum of Law further asserts that "[t]here is nothing in the record which supports a finding that these Defendants had actual or constructive knowledge of a risk of constitutional injury and showed deliberate indifference to that risk."  (ECF No. 65 at 22).

Also related to the supervisory liability claim is the claim in Count 15 of the Amended Complaint, which the plaintiff calls a "Monell" claim.  As aptly noted by the defendants in their Memorandum of Law, "Monell" claims are claims which permit liability against local governing bodies for implementing or executing unconstitutional policies, practices or customs.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 426 U.S. 658, 690-91 (1978).  While defendants Rubenstein and Ballard are state officials and

not local appointed or elected officials, and thus, a true "Monell" claim cannot be brought against them, the plaintiff's allegations contend that defendants Rubenstein and Ballard should be held liable for developing and maintaining "policies, customs and practices exhibiting deliberate indifference to the constitutional rights of the prisoners entrusted to their care, custody and control, which caused the violations of Charles Lively's rights." (ECF No. 32, ¶ 62).  Thus, the plaintiff's "Monell" count really appears to be an extension of his supervisory liability claim, which must be addressed under the *Shaw* factors listed above.  Thus, the undersigned proposes that the presiding District Judge construe and resolve Count 16 in conjunction with Count 14.

Aside from the allegations in his verified Amended Complaint and his self-serving affidavits, which are conclusory in nature on this point, the plaintiff has not offered any evidence whatsoever to support his claim that these defendants had an actual subjective awareness of a pervasive and unreasonable risk of constitutional injury to the plaintiff. Despite the opportunity to develop such facts during discovery, the plaintiff has failed to offer any affirmative evidence to demonstrate any widespread use of excessive force against prisoners at MOCC, or any policy, practice or custom developed or maintained by defendants Rubenstein and Ballard that has encouraged deliberate indifference to the violation of inmates' constitutional rights.  Thus, he cannot meet the essential elements of *Shaw*.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the defendants are entitled to judgment as a matter of law on the plaintiff's claims in Counts 14, 15 and 20 of his Amended Complaint.

### F.      Gross negligence and negligence (Count 16).

In Count 16 of his Amended Complaint, the plaintiff alleges that defendants Rubenstein and Ballard "have been reckless, grossly negligent and negligent in the

supervision, training and monitoring of WV DOC and/or MOCC correctional officers, includ[ing] those who are suspected of crimes of misconduct, or correctional officers who are witness to crimes and misconduct by their fellow officers."  (ECF No. 32, ¶ 75).

The defendants' Memorandum of Law asserts that, while West Virginia law supports claims of negligent hiring and retention (which turn on whether an employer conducted a reasonable investigation into an employee's background and whether the employer should have reasonably foreseen a risk of hiring or retaining an unfit employee), it has not recognized stand-alone claims of negligent training or supervision.  *Webb v. Raleigh Cty. Sheriff's Dep't.*, *supra*, 761 F. Supp.2d at 397-98.  Their Memorandum of Law further states:

> There is no evidence to support a finding that these Defendants negligently hired or retained the Defendant correctional officers.  Both Ballard and Rubenstein gave averred in their Affidavits they [sic; that] the officers were trained.  Commissioner Rubenstein avers that the correctional officers attend the WV Corrections Academy and receive ongoing training on [t]he use of force.  There were no past incidents to lead them to believe that the officers would behave in the manner "as alleged" by Lively, e.g. punching him in the face and making death threats.  Hence, the claims for negligent retention and supervision fail. [FN]
>
> [FN – Further to prevail on this claim Lively would first have to demonstrate that the alleged misconduct occurred.]

(ECF No. 65 at 24-25).

The plaintiff's Response fails to specifically address this claim.  Accordingly, based upon the record before this court, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff has not offered any affirmative evidence to support his claims of negligence and gross negligence in hiring or retention of the Defendant Correctional Officers and that West Virginia law does not support stand-alone claims of negligent training or supervision as alleged in the Amended Complaint.  Therefore, the

undersigned further proposes that the presiding District Judge **FIND** that the defendants are entitled to judgment as matter of law on Count 16 of the plaintiff's Amended Complaint.

### G.   Intentional and Negligent Infliction of Emotional Distress (Count 18).

In Count 18 of his Amended Complaint, the plaintiff alleges as follows:

> 87.     In the course of physically assaulting Charles Lively with excessive and unnecessary use of chemical agents, the excessive and unnecessary use of a stun grenade, the excessive and unnecessary physical slamming of him bodily upon the cold, hard concrete floor, beating, kicking, punching and stomping him excessively and unnecessarily and the excessive and unnecessary tasering, twice, of Charles Lively, the individual defendants Coleman, Matheney, McCloud, Dawson, Richmond, Leasure and Cottrell embarked upon a malicious, sadistic, willful, reckless, and grossly negligent course of conduct intended to cause Charles Lively to suffer extreme mental and emotional distress, agony and anxiety.

> 88.     One objective of this extreme and outrageous course of conduct was to inflict severe mental and emotional distress upon Charles Lively, so as to injure, intimidate, terrify and dissuade him from reporting and exposing the vicious assault and inhumane treatment upon him that he was forced to endure.

(ECF No. 32, ¶¶ 87-88).  The plaintiff further alleges that these defendants knew or should have known that he was "severely injured" and standing disoriented in his cell after being subjected to "excessive amounts of chemical agents and the blast of the stun grenade within the close confines of his secured cell . . . ." but chose to further physically assault him upon entry to the cell by kicking, beating, punching and stomping him all over his body, "while being taunted and threatened with death," and then twice deploying the Taser.  (*Id.*, ¶¶ 89-90).  The plaintiff further alleges that this constituted "misconduct of an egregious nature that exceeds all bounds of usually tolerated behavior by a civilized society" and intentionally or recklessly caused him to suffer extreme mental pain and anguish and emotional distress.  (*Id.*, ¶¶ 90-91).

36

In Syllabus Point 6 of *Harless v. First Nat. Bank in Fairmont*, 289 S.E.2d 692, 694 (W. Va. 1982), the Supreme Court of Appeals of West Virginia (the "SCAWV") set forth the elements of an intentional infliction of emotional distress claim as "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Such a claim is also known as the tort of outrage. *Id.* at 703.

The defendants' Memorandum of Law in support of their Motion for Summary Judgment asserts:

> "[i]n order for a plaintiff to prevail on a claim for intentional infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." Syl. pt. 2, *Philyaw v. E. Associated Coal Corp.*, 219 W. Va. 252, 633 S.E.2d 8, 9 (W. Va. 2006) (quoting Syl. Pt. 3, *Travis v. Alcorn Lab.*, 202 W. Va. 369, 504 S.E.2d 419, 421 (W. Va. 1998)).

(ECF No. 65 at 35). The defendants contends that their actions were taken in good faith and that their conduct was not atrocious or outrageous. (*Id.*) Thus, they assert that this claim fails as a matter of law. (*Id.*) Again, the plaintiff's Response does not specifically address this claim; however, after describing the alleged assault in detail, the plaintiff asserts that he "suffered pain and permanent injuries, both severe in nature, and has also suffered and endured adverse emotional and mental effects that will affect him and his quality of life, present and future . . . ." (ECF No. 68 at 2-4).

The undersigned proposes that the presiding District Judge **FIND** that the allegations contained in the plaintiff's Complaint do not rise to the high level of outrageousness necessary to support a claim of intentional or reckless infliction of emotional distress and, thus, this claim fails as a matter of law.

Likewise, the plaintiff's claim for negligent infliction of emotional distress does not meet the extremely narrow circumstances upon which such a claim may be based under West Virginia law.  As noted in the defendants' Memorandum of Law:

> West Virginia currently recognizes two types of negligent infliction of emotional distress:  1) emotional distress based upon the fear of contracting a disease, and 2) emotional distress based upon "witnessing a person closely related to the plaintiff suffer critical injury or death."   *Wood v. Harshbarger*, 2013 U.S. Dist. LEXIS 147355, 33, 2013 WL 5603243 (S.D. W. Va. Oct. 11, 2013), *citing Marlin v. Bill Rich Constr., Inc.*, 198 W. Va. 635, 482 S.E.2d 620, 638 (W. Va. 1996); *Heldreth v. Marrs*, 188 W. Va. 481, 425 S.E.2d 157, 161 (W. Va. 1992).  Neither type applies to the facts of this case.

(ECF No. 65 at 36).  The plaintiff also failed to address this claim in his Response.

Based upon the above-referenced authority, the undersigned agrees that the plaintiff's claim for negligent infliction of emotional distress fails as a matter of law. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the defendants are entitled to judgment as a matter of law on the plaintiff's claims contained in Count 18 of his Amended Complaint.

## **RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** the defendants' Motion for Summary Judgment (ECF No. 64) with respect to the plaintiff's Eighth Amendment claims against the Defendant Correctional Officers concerning the use of OC spray and the alleged physical abuse of the plaintiff during the cell extraction, and the plaintiff's state law assault and battery claims

against the Defendant Correctional Officers to that same extent.  It is further respectfully **RECOMMENDED** that the presiding District Judge otherwise **GRANT** the defendants' Motion for Summary Judgment (ECF No. 64).

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to the plaintiff, and to transmit a copy to counsel of record.

February 29, 2016

Dwane L. Tinsley
United States Magistrate Judge